**GAF CORPORATION, Plaintiff,**

v.

**EASTMAN KODAK COMPANY, Defendant.**

**No. 73 Civ. 1893 (LWP).**

United States District Court, S. D. New York.

Aug. 3, 1981.

---

Stephen M. Axinn, Henry P. Wasserstein, Dennis J. Drebsky, Jonathan J. Lerner, Irene A. Sullivan, Finbarr J. O'Neill, Sandra D. Thorn, Joseph C. Petillo, Joan M. Secofsky, Georgene M. Vairo, Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff.

Robert MacGrate, Richard E. Carlton, John L. Warden, Jerrold J. Ganzfried, Philip K. Howard, Jeffrey S. Parker, William Farris, William C. Lucas, Mark C. Rosenblum, Sullivan & Cromwell, Helmut F. Furth, New York City, of counsel, for defendant.

## OPINION AND ORDER

PIERCE, District Judge.

This action arises in a context in which it is asserted that for years the defendant Eastman Kodak Company ("Kodak") has

dominated the amateur photographic industry, developing, manufacturing, and selling cameras, film, photofinishing equipment, supplies, and other related products, and providing photofinishing services. Until July 1977, when it ceased its production of film, chemicals, print paper, and slide and movie projectors, and ceased its sales of amateur still and movie cameras, and later, in April 1978, when it sold its photofinishing service organization, GAF Corporation ("GAF") competed with Kodak in many markets within the amateur photographic industry.

By this lawsuit, commenced in 1973, GAF seeks treble damages and equitable relief for Kodak's alleged violations of the federal antitrust laws. GAF presently alleges [1] that Kodak combined and conspired with two flash manufacturers, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, to unlawfully restrain trade in the nationwide market for amateur conventional still cameras. Further, GAF alleges that Kodak monopolized and attempted to monopolize, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, five nationwide markets or submarkets, including the markets for amateur conventional still film, amateur movie film, amateur movie cameras, amateur photofinishing equipment and services, and photographic chemicals for the amateur photofinishing industry.

Now before the Court are five motions for partial summary judgment—one filed by the plaintiff and four filed by the defendant.

## I. *Collateral Estoppel Effect of Berkey*

On January 29, 1973, Berkey Photo, Inc. ("Berkey") instituted an antitrust action against Kodak—an action then Chief Judge Kaufman of the Second Circuit was later to describe as "one of the largest and most significant private antitrust suits in history." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 267 (2d Cir. 1979), *cert.*

*denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Approximately three months later, on April 30, 1973, GAF filed the present action against Kodak, an action apparently broader in its scope than *Berkey*. Identified as related cases, both were assigned to Judge Frankel. In 1976, after discovery and pretrial proceedings (which were jointly coordinated to some degree), Judge Frankel, over Kodak's objection, ordered a prior and separate trial of the *Berkey* case. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 73 Civ. 424, Memorandum dated October 22, 1976 (appended as Exhibit 2 to Kodak's Memorandum in Opposition to GAF's Motion for Partial Summary Judgment Based On Collateral Estoppel).

The jury trial of the *Berkey* action was bifurcated. A liability trial, commencing on July 13, 1977 and ending on January 21, 1978, consumed 109 trial days. A month later, trial was resumed for eight days on the issue of damages, and resulted in a jury verdict of over $37 million in favor of Berkey before trebling. After trial, Kodak's motion for judgment notwithstanding the verdict was granted on certain of Berkey's claims, portions of the damage award were set aside, and certain equitable relief was granted. 457 F.Supp. 404 (S.D.N.Y.1978). On July 3, 1978, a final judgment in excess of $87 million was entered in Berkey's favor.

Thereafter, both sides appealed and on June 25, 1979, a unanimous panel filed its opinion. 603 F.2d 263. Rather than attempt to summarize the Second Circuit's detailed opinion, the disposition of the appeals will be discussed below. Berkey petitioned for certiorari, and Kodak filed a conditional cross-petition for certiorari, to be considered only in the event that Berkey's petition was granted. On March 19, 1980, the Supreme Court denied certiorari, with three Justices dissenting. 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d (1980).

1. GAF's original complaint was filed on April 30, 1973. As the lawsuit progressed, GAF modified and supplemented its claims against Kodak. Pursuant to Orders dated April 22, 1981, May 5, 1981, and June 17, 1981, GAF filed an amended and supplemental complaint on June 18, 1981, which sets forth with reasonable specificity all the claims being pursued by GAF.

GAF now seeks, by motion for partial summary judgment, an order based upon the doctrine of offensive collateral estoppel[2] precluding Kodak from relitigating or denying material facts which it contends were necessarily and conclusively determined in *Berkey*.[3] In essence, GAF claims that, with respect to its claims under § 2 of the Sherman Act, Kodak should be precluded from litigating or denying (1) the definition of three relevant product markets: conventional amateur cameras, amateur film, and color paper, and (2) that it had monopoly power in those three markets.[4] Similarly, with regard to its claims that Kodak violated § 1 of the Sherman Act, GAF contends that Kodak should be precluded from denying or litigating that it engaged in illegal conspiracies with both Sylvania and General Electric in connection with the development of flash devices.[5]

The issues presented by GAF's motion are (1) whether a private plaintiff in a treble damages action may, under the doctrine of offensive collateral estoppel, avail itself of the benefits of rulings adverse to the same defendant in a prior *private* antitrust ac-

tion, and (2) if so, whether offensive collateral estoppel should be applied to the facts of this case. The first issue, and accordingly the second issue, are questions of first impression in this Circuit.

Before beginning its discussion, the Court notes that the Supreme Court has instructed that "the trial court [has] broad discretion to determine when [offensive collateral estoppel] should be applied." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

### A. Offensive Collateral Estoppel in Antitrust Actions

Kodak contends that according to § 5(a) of the Clayton Act, 15 U.S.C. § 16, and the general enforcement scheme of the federal antitrust laws, offensive collateral estoppel can never be applied in an antitrust case. Kodak points to § 5(a) of the Clayton Act, which, prior to its amendment in September 1980, provided that an adverse final judgment or decree in a prior civil or criminal antitrust action brought by the government could be no more than prima facie evidence of a violation by the same defendant in a

---

**2.** The issue preclusion doctrine of collateral estoppel is related to, but distinct from, the doctrine of res judicata. As the Supreme Court succinctly explained in *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979):

> "Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." (Citations omitted).

With regard to the distinction between offensive and defensive use of collateral estoppel, the Supreme Court has stated:

> "[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).

**3.** In opposition to GAF's motion, Kodak submitted a memorandum of law in opposition and a sur-reply brief. Because no provision in the briefing schedule was made for sur-reply briefs, the Court adopted Magistrate Gershon's recommendation that the sur-reply brief not be considered.

**4.** After filing its notice of motion, GAF withdrew its § 2 claims with regard to the conventional amateur camera market and the color paper market. Nevertheless, GAF did not withdraw its collateral estoppel motion as it relates to either of those markets. In addition, although GAF no longer seeks damages with respect to the conventional amateur camera or color paper markets, a determination of the parameters of those markets and Kodak's possession of market power therein *might* (subject to later rulings) be utilized at trial by GAF in support of its monopolization claims in other markets. Accordingly, the Court will rule on the collateral estoppel motion as it relates to all the markets raised in GAF's moving papers.

**5.** The precise facts which GAF seeks to preclude Kodak from litigating or denying are set forth in GAF's "Statement Under Rule 9(g)," filed contemporaneously with its motion.

subsequent action brought by a private plaintiff. Kodak reasoned that since the statute barred the use of preclusive offensive collateral estoppel from a prior *government* action, it would be anomalous to allow a prior *private* action to be given full preclusive effect. This reasoning was founded on the premise that Congress intended government suits, both civil and criminal, to be the mainstays of federal antitrust law enforcement, with private actions playing a secondary role.

Although this argument requires an acceptance of the proposition that Congress proscribed *by implication* the use of offensive collateral estoppel based on a prior private action, the argument nonetheless has some appeal. There is compelling evidence that Congress intended government suits, presumably brought in the public interest, to be the foundation of federal antitrust enforcement. *See* Note, *Section 5(a) of the Clayton Act and Offensive Collateral Estoppel in Antitrust Damage Actions*, 85 Yale L.J. 541, 555–563 (1976) (collecting authorities); *see also* II P. Areeda & D. Turner, Antitrust Law, § 327, at 131 (1978); *but see Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) ("private suits are bulwark of antitrust enforcement").

Kodak's argument, however, was undercut by the enactment of the Antitrust Procedural Improvements Act of 1980, Pub.L. 96–349, on September 12, 1980. The Act amended, *inter alia*, § 5(a) of the Clayton Act to permit full preclusive effect to be given to prior government actions. Pub.L. 96–349 at § 5, amending 15 U.S.C. § 16(a). The avowed purpose of the amendment was to "permit application of the [collateral estoppel] doctrine to eliminate wasteful retrying of issues and reduce the costs of complex antitrust litigation to the courts and parties." H.R.Rep.No. 96–874, 96th Cong., 2d Sess. at 3 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad.News 2716, 2752, 2753;

*see also* H.R.Rep.No. 96–1234, 96th Cong., 2d Sess. at 9 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad.News 2781, 2783; National Commission for the Review of Antitrust Law and Procedures, Report to the President and the Attorney General (Jan. 22, 1979), *reprinted in* 897 Antitrust & Trade Reg.Rep. (BNA) (Special Supp.) at 29–31.[6] Now, given the amended language of § 5(a), the grant of collateral estoppel effect from a prior private action to another private action would not, in this Court's view, relegate government suits to a secondary role.

■ Thus, the Court concludes that offensive collateral estoppel effect may be given to a prior private antitrust action in a subsequent private antitrust suit.

**B.** *Application of Collateral Estoppel to the Case at Bar*

■ The next issue presented is whether offensive collateral estoppel is properly applicable to the case at bar. Briefly stated, the following are preconditions to the application of collateral estoppel: (1) the party against whom collateral estoppel is asserted must have been a party, or in privity with a party, to the prior action; (2) there must have been a final determination of the merits of the issues sought to be collaterally estopped; (3) the issues sought to be precluded must have been necessary, material, and essential to the prior outcome; (4) the issues sought to be precluded must have been actually litigated in the prior action, with the party against whom the estoppel is asserted having had a full and fair opportunity to litigate the issues; and (5) the issues actually and necessarily decided in the prior litigation must be identical to the issues sought to be estopped. *See Montana v. United States*, 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–974, 59 L.Ed.2d 210 (1979); *Parklane Hosiery*, 439 U.S. at 326–337, 99 S.Ct. at 649; *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Yates v. United States*,

---

**6.** In light of the Supreme Court's recent discussion and ruling in *Parklane Hosiery*, 439 U.S. 322, 333–337, 99 S.Ct. 645, 652–654, 58 L.Ed.2d 552, there is little question that the amendment to § 5(a) would withstand a constitutional challenge on Seventh Amendment grounds.

354 U.S. 298, 335–38, 77 S.Ct. 1064, 1085–1087, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Partmar Corp. v. Paramount Pictures Theatre Corp.,* 347 U.S. 89, 100–103, 74 S.Ct. 414, 420–422, 98 L.Ed. 532 (1954); *Emich Motors Corp. v. General Motors,* 340 U.S. 558, 568–69, 71 S.Ct. 408, 413–414, 95 L.Ed. 534 (1951). In addition, in exercising its discretion, the trial court may only invoke offensive collateral estoppel when the plaintiff could not have easily joined in the prior action and when application of the doctrine would not be unfair to the defendant. *Parklane Hosiery,* 439 U.S. at 331, 99 S.Ct. at 651. The issues sought to be collaterally estopped in the present action—first the § 2 issues and then the § 1 issues—will be evaluated in light of the foregoing guiding principles.

### 1. Section 2 Claims

The jury in *Berkey* found that Kodak monopolized three relevant markets: conventional amateur cameras, amateur film, and color paper—to the injury of Berkey. The conventional amateur camera market consisted of 110 and 126 instant loading cameras and simple box type cameras which take roll films, but excluded instant print cameras and 35mm cameras. *See* 603 F.2d at 269 n.2. The amateur film market consisted of all amateur conventional film, including black and white and color film, still and movie film, and slide and print film, but excluded the film used in instant picture cameras. *See id.* The parties stipulated that the color paper market consisted of the paper used to make color prints from amateur film.

The jury awarded treble damages to Berkey for Kodak's violations with respect to the each of these markets. Thereafter, Judge Frankel denied Kodak's motion for judgment notwithstanding the verdict with respect to amateur camera and amateur film damages, but granted Kodak's motion with respect to color print paper. 457 F.Supp. at 410–27.

On appeal, the Second Circuit reversed the jury's award of damages relative to the camera market. 603 F.2d at 279–90. The Court also reversed and remanded for a new trial the jury's award of damages relative to the amateur film market and reversed the trial court's grant of Kodak's judgment n.o.v. motion regarding the color paper market. 603 F.2d at 293–99. In reaching these results, however, the panel specifically upheld the jury's delineation of the relevant markets. 603 F.2d at 268–71. Further, the Circuit found that the evidence was sufficient for the jury to find that Kodak possessed monopoly power in the amateur camera, amateur film, and color paper markets. 603 F.2d at 273, 279 (cameras), 299 (film and color paper). Thus, GAF seeks to preclude Kodak from relitigating these market definition and monopoly power issues. Those issues will now be examined in light of the collateral estoppel prerequisites previously set out.

#### a. Identity of Defendants

The requirement that the party against whom collateral estoppel is asserted must have been a party, or in privity with a party, to the prior action is not an issue here, since Kodak was the defendant in both cases.

#### b. Finality

Although Kodak concedes that there is a final judgment with respect to Berkey's § 2 camera claims, Kodak argues that since the judgment is in its favor, the market definition and monopoly power findings of the jury and their approval are void for collateral estoppel purposes. With respect to the film and color paper decisions, Kodak contends that they have no independent legal significance now, are subject to revision at a later date, and may never have any legal significance if Kodak ultimately prevails on those issues, as it has on Berkey's camera contentions.

■ This Court rules that Kodak's proposed narrow readings of the finality requirement of collateral estoppel is too restrictive and not well supported by the case law. While the Court does not accept GAF's contention that, pursuant to South-

ern District of New York Local Civil Rule 43, the Second Circuit mandate is sufficient to constitute a final judgment with respect to the market definition and monopoly power rulings in *Berkey*, those rulings by the Second Circuit are certainly the "law of the case." The Second Circuit has held that the "finality" requirement of collateral estoppel is satisfied by determinations that were merely "law of the case." *Zdanok v. Glidden*, 327 F.2d 944, 955 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964) (" 'Finality' ... may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."). *See* Restatement of Judgments 2d, Tent. Draft No. 1, § 41 (1973). Thus, the determination of issues by the jury which were subsequently affirmed by the Second Circuit satisfies the finality requirement of collateral estoppel.[7]

### c. Determination Necessary and Essential to the Prior Determination

◼ In order to prevail on a monopolization claim, a plaintiff must prove, sequentially, the following elements: (1) the relevant market, (2) the defendant's possession of monopoly power in that market, (3) the defendant's misuse of the power by anticompetitive behavior or otherwise, (4) injury to the plaintiff resulting from the misuse of monopoly power, and (5) sufficient facts to support a determination of monetary damages to compensate for the injury. In order to determine whether a defendant engaged in conduct violative of § 2, a court must first determine the relevant market and the existence of monopoly power. Only then can the court determine whether or not the defendant abused its monopoly power.

◼ Simply stated, the Second Circuit had to reach the questions of market definition and monopoly power in deciding to reverse the damages award regarding cam-

eras and reverse and remand the films and color paper claims as it did. Regardless of the Berkey panel's decisions regarding misuse of power, injury, or proof of damages, the market and power issues were necessarily decided. This conclusion is supported by the cases which hold that relitigation of alternative but essential issues may be precluded. *Winters v. Lavine*, 574 F.2d 46, 66–67 (2d Cir. 1978); *Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir.), *cert. dismissed*, 434 U.S. 944, 98 S.Ct. 469, 54 L.Ed.2d 323 (1977).

### d. Prior Issues Actually and Fully Litigated

◼ Kodak raises several arguments in support of its position that the market definition and power issues were not actually and fully litigated. Initially, it contends that these issues were not fully litigated because other issues dominated the litigation, especially at the appellate stage and because significant portions of the issues were stipulated. As to the first portion of this argument, the Court notes that the issues were vigorously litigated before Judge Frankel and the jury. Failure to raise these issues on appeal does not alter their preclusive effect. *See Winters v. Lavine*, 574 F.2d at 62–63; *see also Cyclops Corp. v. Fischback & Moore, Inc.*, 71 F.R.D. 616, 618 (W.D.Pa.1976); *Sherman v. Jacobson*, 247 F.Supp. 261, 270 (S.D.N.Y.1965). Regarding the use of stipulations, the decision to agree to certain facts was a decision made by Kodak as part of its litigation strategy. Several courts, including the Second Circuit, have recognized that collateral estoppel should not be barred because a party entered into stipulations. *Tillman v. National City Bank of New York*, 118 F.2d 631, 635 (2d Cir.), *cert. denied*, 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521 (1941); *Fairmont Aluminum Co. v. Commissioner*, 222 F.2d 622, 625 (4th Cir.), *cert. denied*, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955); *Wil-*

---

7. Kodak contends that because Judge Frankel entered judgment n.o.v. in Kodak's favor on the color paper claim, there is no judgment on which a finding of monopoly power could be implied. This argument is unpersuasive in light of the Second Circuit's express statement that "there will be no need to retry the issue of market power [in the color paper market]." 603 F.2d at 299.

*liamson v. Columbia Gas & Electric Corp.,* 186 F.2d 464, 466–67 (3d Cir. 1950), *cert. denied,* 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355 (1951).

Kodak further argues that because a general verdict form was used by the trial court in *Berkey,* a practice criticized on appeal, 603 F.2d at 279, it is difficult to determine what the jury actually decided. Kodak contends that GAF bears the burden of showing what was actually decided, rather than what should have been decided, and that failure to remove a reasonable doubt as to what was actually decided in *Berkey* should preclude the application of collateral estoppel. *McNellis v. First Federal Savings and Loan Association,* 364 F.2d 251, 257 (2d Cir.), *cert. denied,* 385 U.S. 970, 87 S.Ct. 504, 17 L.Ed.2d 434 (1966). While the Court concedes that the *Berkey* verdict form makes it difficult to determine the exact findings of the jury regarding market definition and monopoly power, the jury was given a thorough charge on the elements of a § 2 monopoly claim, including the applicable legal standards for determining market parameters and monopoly power. Accordingly, this Court must assume, as did the Second Circuit, *see supra* at 1212, that the jury made specific findings as to the relevant markets and power in reaching their verdict.

Finally, Kodak argues that it was denied a full and fair opportunity for an actual judicial resolution of the issues, because of the prejudice created by the testimony of Merton J. Peck, one of Kodak's expert witnesses upon whom Kodak relied to prove its alleged market definitions. This claim essentially relates to the question of whether it would be fair to give preclusive effect to selected § 2 *Berkey* determinations and will be considered below in conjunction with Kodak's other "fairness" arguments.

### e. *Identity of Issues*

Regarding the question of whether the market definition and market power issues determined in *Berkey* and presented in this case are identical, Kodak contends that the *Berkey* determinations are temporally distinct from the issues presented here. Al-

though the *Berkey* verdict contains no specific reference to the time period covered, the evidence at the liability trial was apparently restricted to pre-1977 occurrences and documents. In the present case, damages are claimed through mid-1977 when GAF was allegedly driven out of business by Kodak's anticompetitive activities. Kodak contends that its introduction of instant photographic products in 1977 and a drop in its 1977 camera market share could lead a jury to different conclusions with regard to market definition and power than were reached in *Berkey.*

The Court, however, concludes that the slightly different time period covered by the evidence in this case would not likely cause a jury to find different market definitions or reach different conclusions as to Kodak's market power. The slim possibility that the jury could reach a different conclusion is insufficient justification for relitigating issues vigorously and fully contested by Kodak over the course of several months in the *Berkey* trial.

### f. *Plaintiff's Ability to Join in Prior Action*

Rather than wholeheartedly endorsing the doctrine of offensive collateral estoppel, the Supreme Court in *Parklane Hosiery* cautioned that the policies of judicial economy could be frustrated by the application of offensive collateral estoppel in instances in which the plaintiff could easily join in an earlier action, but instead adopts a " 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." 439 U.S. at 330, 99 S.Ct. at 651. In such a case, the plaintiff "will have everything to gain and nothing to lose by not intervening in the first action." *Id.*

As noted earlier, GAF and Berkey requested separate trials, while Kodak sought a consolidated trial. In an Order dated September 22, 1976, Judge Frankel ordered *Berkey* to be tried first and separate from GAF. Judge Frankel's decision was founded upon the following rationale:

"The issues in the two cases are different in substantial respects. The *GAF* case is larger, more complex, and likely to require much more trial time. The *Berkey* case is more nearly ready for trial, and there is unwarranted prejudice to this plaintiff in waiting for the other. There are counterclaims against Berkey, none against GAF. Overall, the prejudice to plaintiffs from a joint trial outweighs the burdens upon defendant of separate trials. Not least of all, the fact that these are to be jury trials, *upon defendant's insistence,* counsels against consolidation. Each case separately promises to be extraordinarily complex. The problem of guiding lay persons through these long and intricate proceedings will be difficult enough for everyone if the cases are tried one at a time." (Emphasis added).

The foregoing language makes clear that Berkey was not an action that GAF could have "easily joined in." The complexity of each case and the fact that counterclaims were being asserted by Kodak against Berkey, coupled with the fact that, at Kodak's insistence, both cases were jury trials, indicates that GAF is not the "wait and see" plaintiff contemplated by *Parklane Hosiery.*

### g. *Fairness to Defendant*

The final and perhaps preeminent question to be considered by the trial judge in exercising his broad discretion is whether the application of offensive collateral estoppel "would be unfair to the defendant." *Id.* at 331, 99 S.Ct. at 651. Kodak points to three separate factors which it contends makes application of offensive collateral estoppel unfair: (1) the "Peck incident", (2) the unavailability of Gerald B. Zornow as a witness at the Berkey trial, and (3) GAF's late production of four documents. Each will be briefly discussed in turn.

The so-called "Peck incident" relates to the cross-examination of Merton J. Peck, Kodak's sole expert witness at the Berkey trial. The incident was fully described and discussed by the Second Circuit in considering Kodak's appeal. 603 F.2d at 305–308. In brief, Judge Frankel allowed plaintiff's counsel to cross-examine Peck with respect to the alleged destruction of documents and a 1915 decree entered against Kodak in a government antitrust suit.

Here, Kodak contends that the Peck incident was highly prejudicial to its defense and such prejudicial effects should not be perpetuated by the application of offensive collateral estoppel. However, the Second Circuit considered Kodak's prejudice argument and rejected it.

"We are not unmindful that the incidents described, as presented to the jury, led to the unfortunate consequence of casting Kodak's attorneys, and the defendant itself, in a highly unfavorable light. It is no less true, however, that the cross-examination elicited information that was highly relevant to an assessment of the independence of judgment and probity of one of Kodak's principal witnesses. Where the trial judge was taken great care to balance the probative value of the evidence against the prejudice that may accrue from its introduction, we think it inappropriate to substitute our judgment for his." 603 F.2d at 308.

That Peck may not be called as a witness at the trial of the present action is irrelevant. The question before this Court is whether application of offensive collateral estoppel to the market definition and market power issues would be unfair in light of the Peck incident. Based upon the Second Circuit's ruling and the fact that the testimony of Peck was only a part of Kodak's defense case in *Berkey,* the Court concludes that the Peck incident should not preclude application of collateral estoppel in this case.

Secondly, Kodak contends that the unavailability of Gerald B. Zornow as one of its witnesses at the *Berkey* trial should preclude the application of collateral estoppel. During the time period relevant to *Berkey* and this case, Zornow served as Kodak's chief marketing executive and then its president and chairman of the board. Due to illness, Zornow was unable to testify at the *Berkey* trial. Zornow, however, had been deposed prior to trial by Berkey's counsel. During the course of that deposi-

tion, Kodak's counsel did not "cross-examine" Zornow, apparently anticipating that Zornow would be available to Kodak as a witness at trial. *See* Affidavit of David A. Weir, Esq., sworn to July 30, 1980 at ¶ 6. In essence, Kodak argues that much of Berkey's proof regarding market definition and market power relied upon deposition testimony of Zornow, and that subsequent deposition testimony of Zornow indicates that the prior deposition testimony was incomplete and misleading.

Initially, the Court notes that while Zornow's deposition testimony may have been important to Berkey at trial, it was apparently corroborated by other Berkey witnesses and Kodak witnesses. *See* Affidavit of Dennis J. Drebsky, Esq., sworn to August 15, 1980 at ¶ 9. In addition, Kodak was free to "cross-examine" Zornow before trial, but failed to do so, presumably as part of its litigation strategy. Finally, the post-trial deposition testimony of Zornow (*see* Weir affidavit) does not unequivocally indicate that the market definitions or market power determinations of the jury would have differed in the event that Zornow had appeared at trial. In sum, the Court concludes that Zornow's failure to testify at the *Berkey* trial would not render unfair the application of offensive collateral estoppel to the present action.

■ Finally, Kodak contends that GAF failed to produce prior to the *Berkey* trial four requested documents which indicate that instant cameras and films are in the same markets as conventional products. *See* Affidavit of Helmut F. Furth, Esq., sworn to July 15, 1980. Kodak alleges that if it had presented these four documents at the *Berkey* trial, the jury could have found different market definitions, and accordingly, made different market power findings.

Despite Kodak's assertions, even reading these documents in a light most favorable to Kodak, the Court finds that the four documents are of marginal value in proving that instant and conventional products are in the same relevant product markets. Parenthetically, while the Court does not wish to condone GAF's apparently belated production of these four documents, there is no evidence that GAF intentionally withheld the four documents until the close of the *Berkey* trial. In short, there appears to be no compelling reason to allow the late production of four marginal documents to stand in the way of the application of offensive collateral estoppel. As previously discussed, the question of whether instant and conventional products were in the same relevant market was fully, fairly, and fiercely litigated in *Berkey.*

h. *Conclusion Regarding Application of Offensive Collateral Estoppel to GAF's § 2 Claims*

■ The determination of the parameters of the amateur camera, amateur film, and color paper markets, and Kodak's possession of monopoly power in those markets were fairly, fully, and finally litigated in *Berkey.* Indeed, Kodak had two powerful incentives to vigorously litigate the action. First, it sought to avoid a treble damage verdict against it by Berkey, and second, it knew after Judge Frankel ordered separate trials that an adverse decision in *Berkey* might well have collateral estoppel effect in other pending antitrust actions against Kodak, especially GAF's suit. Additionally, there are "no procedural opportunities available to [Kodak in the present action] that were unavailable in the [*Berkey*] action of a kind that might be likely to cause a different result." *Parklane Hosiery,* 439 U.S. at 332, 99 S.Ct. at 652. In short, application of offensive collateral estoppel to the market definition and monopoly power issues would not be unfair to Kodak. Accordingly, GAF's motion for partial summary judgment with regard to the § 2 issues is granted.

2. *Section One Claims*

As mentioned earlier, GAF seeks to preclude Kodak from denying or litigating that it engaged in illegal conspiracies, in violation of § 1 of the Sherman Act, with both Sylvania and General Electric in connection with the development of the magicube and flipflash devices.

In *Berkey*, the jury found that Kodak unlawfully conspired with Sylvania and GE to restrict the flow of information regarding the development of the magicube and the flipflash devices, respectively, in violation of § 1. The jury found that these § 1 violations caused injury to Berkey and awarded damages to it. On appeal, the Second Circuit affirmed the jury's findings of § 1 violations with respect to the magicube and flipflash conspiracies, affirmed the award of damages with regard to lost camera sales in 1970 due to the magicube conspiracy, and remanded for a new trial the determination of 1971 magicube conspiracy damages and flipflash conspiracy damages. 603 F.2d at 299–305.[8]

The Court finds that all the preconditions to application of offensive collateral estoppel—previously discussed in detail with respect to GAF's § 2 claims—are satisfied with regard to the magicube and flipflash conspiracies. Aside from those items discussed with regard to GAF's § 2 claims, Kodak's only other challenge to the application of offensive collateral estoppel to the magicube and flipflash claims asserted by GAF is that such an application is inappropriate because the findings sought to be given estoppel effect were of the type "likely to be decided on the basis of a jury's choice among different factual inferences." *Berner v. British Commonwealth Pacific Airlines*, 346 F.2d 532, 541 (2d Cir. 1965), *cert. denied*, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). Kodak's reliance upon *Berner* is misplaced. That case involved a multiple accident case in which a plaintiff sought to use a prior unappealed $35,000 judgment against the defendant to estop the same defendant from litigating a $7 million claim based upon similar facts. The *Berner* panel merely held, in accord with *Zdanok*, 327 F.2d at 955–56, that mutuality of estoppel should not be readily discarded in multiple accident cases. 346 F.2d at 540–41. Similarly, Kodak's reliance upon *Divine*

*v. Commissioner of Internal Revenue*, 500 F.2d 1041 (2d Cir. 1974), a tax case, is unfounded. There, the Court ruled that collateral estoppel should not apply to a tax case because of the unsettled legal decisions of different tribunals interpreting the Internal Revenue Code. The Court, however, recognized that in cases in which complex factual issues are applied to settled legal principles, collateral estoppel should be applied. *Id.* at 1048–49.

In short, the overriding policy factors found in *Berner* and *Divine* mitigating against the use of collateral estoppel are not present in the case at bar. Further, for the reasons previously stated, *supra* at 1215–1216, the Court does not believe it would be unfair to Kodak to give collateral estoppel effect to the magicube and flipflash conspiracy rulings from *Berkey*. Accordingly, the plaintiff's motion for partial summary judgment with respect to the magicube and flipflash conspiracies is granted.

### C. *Summary of Part I*

Antitrust litigation and trials are frequently and increasingly criticized for being too costly, time-consuming, and complex. *See* National Commission for the Review of Antitrust Laws and Procedures, Report to the President and the Attorney General 11 (Jan. 20, 1979); S.Rep.No. 96–238, 96th Cong., 1st Sess. 3 (1979). Indeed, Congress has evidenced its intention and concern about the matter by giving full preclusive effect to prior government antitrust suits in order to "eliminate wasteful retrying of issues and reduce the cost of complex litigation to the courts and the parties." H.R. Rep.No. 96–874, at 3.

In exercising the discretion prescribed by the Supreme Court, this Court finds that the issues for which GAF seeks preclusion were fully, fairly, and fiercely contested by Kodak in the *Berkey* action, with full knowledge that the day would come when

---

8. Contrary to Kodak's contention, the Second Circuit's affirmance of the jury's finding of § 1 liability from the magicube and flipflash conspiracies and the Circuit's mandate were not "avowedly tentative." As previously discussed, *supra* at 1212–1213, a ruling on liability without a final judgment of damages is sufficiently final for collateral estoppel purposes. *See e. g., Zdanok v. Glidden Co.*, 327 F.2d at 955.

GAF sought to use the *Berkey* findings to its advantage. For all the reasons discussed, the limited application of offensive collateral estoppel sought by GAF would not be unfair to Kodak.

Application of collateral estoppel to the § 2 issues of relevant market definition and monopoly power and the § 1 issues of the illegality of the magicube and flipflash conspiracies will promote the public interest by preventing needless and repetitious litigation and by conserving the resources of the Court and the parties. Accordingly, the plaintiff's motion for partial summary judgment is granted in full.

## II. *GAF's Standing to Assert Section 1 Camera Claims*

As previously mentioned, GAF alleges, *inter alia*, that Kodak entered into agreements with Sylvania and General Electric in connection with two joint research programs, which violated § 1 of the Sherman Act by restraining the flow of information regarding flash device developments to other camera manufacturers. The joint research projects resulted in the introduction of the "magicube" by Sylvania in 1970, the "flipflash" by General Electric in 1975, and cameras capable of utilizing these new flash devices by Kodak in each of those years. In *Berkey,* the Second Circuit affirmed verdicts against Kodak with respect to these joint research programs, holding that the jury could properly have found that these programs unreasonably restrained competition by Berkey "in the production of cameras that could cooperate with the new flash device," and that Berkey was entitled to recover lost profits on sales lost as a result of the restraint on the flow of information from Sylvania and GE and Kodak. *See* 603 F.2d at 299–304.

The Court has ruled that Kodak shall be estopped from relitigating the illegality of these two joint research programs. Here, GAF alleges that the restraint on the flow of information regarding the magicube and the flipflash allowed Kodak to introduce cameras compatible with the new flash devices well in advance of GAF, forcing GAF to sell its old model cameras in competition with Kodak's magicube and flipflash cameras, and preventing GAF from selling a new model magicube or flipflash camera in competition with Kodak's cameras that were compatible with the new flash devices. GAF seeks treble damages for the losses it allegedly sustained due to the magicube and flipflash agreements.

Kodak moves to dismiss these claims on the grounds that GAF lacks standing to assert them. Kodak contends that GAF did not manufacture cameras; that GAF's business was outside the "target area" of the alleged antitrust violations; and that GAF's injury from the magicube and flipflash conspiracies, if any, was derivative of the impact on the camera manufacturers who competed with Kodak. This Court disagrees.

Section 4 of the Clayton Act, 15 U.S.C. § 15, confers standing upon parties asserting claims under the federal antitrust statutes (including § 1 of the Sherman Act) as follows:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... without respect to the amount in controversy ...."

Literally read, this statute would provide antitrust standing to virtually any party affected by an antitrust violation, regardless of the remoteness of the injury. As the Supreme Court has recognized, however, "[t]he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972).

The doctrines of "standing", "pass-on" (*see Illinois Brick Co. v. State of Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)), and "antitrust injury" (*see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)), have been developed in order to limit the portals to a treble damages action.

With respect to the standing issue presented here, the Supreme Court has provided no direct guidance. Consequently, the Court looks to the decisions of the lower courts, primarily those of the Second Circuit, to determine the standard which governs standing to assert treble damages claims.

A brief review of earlier decisions and the decisions of other Circuits is helpful in placing the current law of this Circuit in perspective. In a seminal case decided shortly after enactment of the Sherman Act, the Third Circuit denied standing to a shareholder, creditor, director, and employee of a corporation that went bankrupt as a result of the defendant's alleged monopolization of photographic supplies. *Loeb v. Eastman Kodak Co.*, 183 F. 704 (3d Cir. 1910). By reasoning that only a person directly injured by the violation—in that case the corporation—had standing under Section 4, the court promulgated the standard which became known as the "direct injury" test.

In the early 1950's, the "target area" test for standing was developed by the Ninth Circuit. *See Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358 (9th Cir. 1955); *Conference of Studio Unions v. Loew's, Inc.*, 193 F.2d 51 (9th Cir. 1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). Thereafter, the "target area" label was used by most circuit courts, but the various formulations of the "test" varied from circuit to circuit. The Second and Third Circuits adopted a narrower "target area" test, closely related to the "direct injury" test. *See, e. g., Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Harrison v. Paramount Pictures, Inc.*, 115 F.Supp. 312 (E.D.Pa.1953), *aff'd*, 211 F.2d 405 (3d Cir.), *cert. denied*, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954). In contrast, other circuit courts, notably the Ninth Circuit, used the "target area" label, but more broadly defined target area to include all persons who, with reasonable foreseeability, would be affected by the alleged antitrust violation. *See, e. g., Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073 (9th Cir. 1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414 (4th Cir.), *cert. denied*, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). These various "target area" tests have led to different results in substantially identical cases. *Compare Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) (standing denied) with *Congress Building Corp. v. Loew's Inc.*, 246 F.2d 587 (7th Cir. 1957) (standing granted). More recently, due to dissatisfaction with the "target area" formulation, several circuits have abandoned the test in favor of generally broader tests of standing.[9]

---

**9.** In *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir. 1975), the Sixth Circuit adopted the "zone of interests" standing test, first established in an administrative law context in *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). *See also Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir. 1981), *cert. pet. filed*, 50 U.S.L.W. 3005 (July 2, 1981). The Ninth Circuit, at least in dicta, has looked with approval upon the "zone of interests" approach and appears to be moving toward a standard broader than foreseeability. *California State Council of Carpenters v. Associated General Contractors of California, Inc.*, 648 F.2d 527, n.18 (9th Cir. 1980). The Third Circuit has apparently disposed of the target area test, at least in name, in favor of a "balancing test comprised of many constant and variable factors." *Bravman v. Basset Furniture Indus-* tries, 552 F.2d 90, 99 (3d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). In addition, the Court notes that the commentators in this area, while offering different approaches to the standing question, are generally in agreement that the law is in a state of flux and confusion. *See* Tyler, *Private Antitrust Litigation: The Problem of Standing*, 49 U. Colorado L.Rev. 269 (1978); Berger and Bernstein, *An Analytic Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977); Sherman, *Antitrust Standing: From Loeb to Malamud*, 51 N.Y.U.L. Rev. 374 (1976); Letter and Reply, 51 N.Y.U.L. Rev. 1102 (1976); Lytle and Purdue, *Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation*, 25 Am.U.L.Rev. 795 (1976); Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits*, 71 Colum.L.Rev. 1 (1971).

Turning to the controlling precedents of the Second Circuit, as noted earlier, this Circuit adopted a narrow target area test in determining antitrust standing. In *Billy Baxter*, 431 F.2d at 187–89, a divided panel affirmed the district court's grant of defendants' summary judgment motion on the grounds that a soft drink franchisor lacked standing to sue for alleged anticompetitive actions taken against its franchisees. The franchisees manufactured and sold beverages and remitted royalties to the plaintiff based on the number of bottles sold. The plaintiff franchisor alleged that its royalties were reduced due to the defendants' anticompetitive acts. The court ruled that the franchisor was not in the "target area" of the defendants' illegal acts. The majority, per Judge Anderson, instructed that the area of economic activity rather than the product should be considered and, accordingly, it is "necessary to examine a given plaintiff's role in these processes to determine whether it has the requisite relationship to the type of wrong alleged." *Id.* at 188. In denying standing to the franchisor, the majority noted that the plaintiff was not "a firm with comprehensive responsibilities for and identification with the beverages." *Id.*

A year later, another divided panel affirmed the dismissal of a suit by a non-operating movie house landlord against its lessees and motion picture distributors on the ground that the plaintiff was not in the target area of an alleged conspiracy which restricted the number of first run movies shown at theatres managed by plaintiff's lessees, thereby reducing rental payments made to the plaintiff. *Calderone*, 454 F.2d at 1295–97. The majority ruled that the target area test was applicable and stated the perceived rationale behind that test. In sum, the rule accommodates a sufficient number of private plaintiffs to deter antitrust law violations, and at the same time recognizes that there must be limitations on the use of the treble damage weapon to prevent an "over-kill". *Id.* at 1295. In addition, the court reasoned that due to the uncertain parameters of substantive antitrust violations, standing should be kept narrow. *Id.* According to the majority, the target area test is a "rule of reason" which recognizes and conforms to the above-stated policies. *Id.* at 1296. The majority defined a "target" as "a person or business against which competitive aim is taken" and stated that "to have standing one must be an object of an antitrust conspiracy." *Id.* at 1296 n.2. Cited as an example of a person against whom a conspiracy is aimed was "a competitor of the person sued." *Id.* at 1295. Importantly, the majority expressly rejected the dissent's proposed adoption of the "foreseeability" test used by the Ninth Circuit and previously discussed herein. *Id.* at 1296 n.2.

Until 1980, the Second Circuit continued to adhere to the target area test rooted in *Billy Baxter* and *Calderone*, and the district courts in this Circuit apparently applied this test in approaching antitrust standing issues. *See Western Geophysical Co. v. Bolt Associates*, 584 F.2d 1164, 1175 (2d Cir. 1978); *Long Island Lighting Co. v. Standard Oil*, 521 F.2d 1269 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Bowen v. New York News, Inc.*, 522 F.2d 1242 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Laurie Visual Etudes, Inc. v. Cheesebrough-Pond's, Inc.*, 473 F.Supp. 951 (S.D.N.Y.1979) (Weinfeld, J.); *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority*, 451 F.Supp. 157 (S.D.N.Y.1978); *Sulmeyer v. Seven-Up Co.*, 411 F.Supp. 635 (S.D.N.Y.1976); *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10 (S.D.N.Y.1976) (Weinfeld, J.), *aff'd on other grounds*, 550 F.2d 68 (2d Cir. 1977), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

In *Schwimmer v. Sony*, 637 F.2d 41 (2d Cir. 1980), the Second Circuit arguably broadened the scope of the target area test. The court affirmed, *inter alia*, the dismissal of the plaintiff's price discrimination suit against Sony on the grounds that the plaintiff, an indirect purchaser from Sony, lacked standing. The plaintiff was an authorized Sony dealer that bought directly from Sonam which in turn purchased from Sony. The plaintiff charged that Sony en-

gaged in price discrimination in violation of Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) due to the alleged differences in prices charged by Sony to Sonam, Sony's United States Distributor, and to Interocean, Sony's distributor for Central and South America.

In concluding that the plaintiff, an indirect purchaser, lacked standing to sue, the opinion cited with approval the target area rule of *Calderone. Schwimmer*, 637 F.2d at 46–48. The court continued, however, by citing and quoting from leading Ninth Circuit cases that clearly apply the same foreseeability test unequivocally rejected by the majority in *Calderone. Schwimmer*, 637 F.2d at 47–48. The discussion concluded with the enunciation of the following standard: "Thus, an indirect purchaser is considered a 'target' of a seller's price discrimination if there is evidence that the discrimination was 'aimed at' the indirect purchaser by virtue of the nature and foreseeable effect of the conspiracy." *Id.* at 49. The Court also ruled that in order to have standing the plaintiff need not prove the defendant's specific intent to include the plaintiff in its "target area". *Id.* at 47 and n.15. In dicta, the Court stated that "evidence of a seller's specific intent to restrain trade among indirect purchasers necessarily confers standing on those more remote customers." *Id.* at n.15.

Although the viability of the narrower *Billy Baxter-Calderone* target area test might be called into question by *Schwimmer*, a fair reading of the opinion indicates that the panel did not purport to rewrite the law of the Circuit. While the foreseeability language of the Ninth Circuit opinions cannot be ignored, those cases were arguably relied upon solely to support the proposition that specific intent is not required under the target area test.

In fact, *Reading Industries v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir. 1980), cert. denied, —— U.S. ——, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981), the case that followed *Schwimmer* and the most recent ruling from the Circuit in this area, indicates that *Schwimmer* did not substantially alter the prevailing law of the Circuit. Writing for a unanimous panel, Judge Newman affirmed a grant of summary judgment dismissing the suit on the ground that the plaintiff, a refiner of copper scrap and manufacturer of copper tubing, lacked standing to sue the defendants, vertically integrated copper producers, for holding *down* the price of their refined copper thereby causing scrap prices to remain *higher.*

At the outset, the Circuit Court noted that the difficulty in applying the prevailing standing rules may be "partially due to uncertainty as to whether the pertinent inquiry concerns whether a proper plaintiff is suing or whether a proper claim is being pursued." *Id.* at 12. Notably, the panel stated that the target area test and the direct injury test "are ultimately tests of whether there is a legally significant causal relationship between the alleged violation and the alleged injury." *Id.* at 13. Applying this principle, the court found that the causal relationship between the defendant's alleged violation and the plaintiff's payment of high scrap prices was too remote, tenuous and conjectural to permit the imposition of liability. *Id.* at 13–14.

In summary, the Second Circuit appears to have adhered to the narrower target area test for standing in its recent opinions.

Application of the prevailing target area test to the facts of the case at bar clearly indicates that GAF has standing to assert its Section 1 camera claims against Kodak. In support of its motion, Kodak contends that the alleged conspiracy between itself and Sylvania and General Electric was aimed solely at camera manufacturers. Since GAF did not manufacture cameras during the relevant time period, Kodak urges the Court to dismiss GAF's claims pursuant to the *Billy-Baxter-Calderone* line of cases.

Kodak's motion, however, is grounded on a very narrow definition of "manufacturer" and ignores GAF's "role in the [camera production] processes" and "its comprehensive responsibilities for and identification with [its cameras]." *Billy Baxter*, 431 F.2d at 188. It is uncontroverted that GAF did

not own a plant or facility for the manufacture of cameras during the relevant time period. This is not to say, however, that GAF was not involved in the "production" of cameras. Although elementary, it is important to note that the actual manufacture of a product—that is the physical construction or assembly of a product—is only one phase of the production process. Prior to assembly, a product must be designed and specifications must be given to the manufacturer. Often, but not in all cases, the design is conceived and finalized by the same firm that assembles the product. While Kodak operated in this manner, GAF has presented evidence showing that it designed cameras that ultimately bore the GAF label, provided specifications to foreign manufacturers, and contracted with those manufacturers to procure the raw materials and build the cameras. The assembled cameras were then returned to GAF for testing, packaging (often in an "outfit" consisting of the camera, film, and flash), and sale to distributors or other private label sellers. Under this production scheme, the responsibility for designing cameras remained with GAF. The firms with whom it contracted to build the cameras were required to build the cameras according to GAF's specifications.

Given this production scheme, GAF was clearly within the "target area" of the alleged conspiracies between Kodak and Sylvania and General Electric. Pursuant to the magicube and flipflash conspiracies, Sylvania and General Electric allegedly withheld information regarding the magicube and flipflash until introduction of the flash devices and Kodak cameras that were compatible with the new devices. Naturally, the parties most interested in information regarding the new flash devices would

be those responsible for *designing* cameras. Of course, those designs would ultimately lead to the manufacture of cameras to be sold; but, the crucial first step—prerequisite to the manufacture of a camera compatible with the new flash device—was the design of such a camera.

As the designer of its brand-name cameras, GAF would have been most interested in the new flash information. Insofar as GAF's cameras were concerned, GAF's foreign manufacturers would have had, at most, a secondary interest in the new flash information; those manufacturers were contractually committed to build cameras according to GAF specifications. Thus, GAF is the appropriate plaintiff to assert the within claims, consistent with the policy objectives enunciated in *Calderone*, 454 F.2d at 1295–96, and discussed *supra* at 1220.

In short, the purpose of the alleged magicube and flipflash conspiracies was to place those who designed 126 format and 110 format cameras a step behind Kodak, thereby placing the manufacture, distribution, and ultimate marketing of the rival cameras one step behind Kodak. As the firm that designed 126 and 110 cameras, had the cameras assembled according to its own specifications, tested the cameras, packaged the cameras, distributed the cameras, and serviced the cameras, GAF was unquestionably within the target area of the alleged conspiracies.[10]

The rather simple causal chain alleged by GAF is not too tenuous or speculative to preclude liability as was the case in *Reading*. In essence, GAF alleges that the restraint on new flash devices information placed GAF at a temporal disadvantage in the design of compatible cameras, which in turn placed it at a temporal disadvantage in

10. This conclusion is supported by the documents appended to GAF's papers in opposition which indicate that Kodak considered GAF a direct competitor on the manufacturing level and that both Sylvania and GE viewed GAF as an original equipment manufacturer. By referring to these documents, however, the Court is not adopting nor endorsing the dicta of *Schwimmer*, 637 F.2d at n.15, which stated that "evidence of a seller's specific intent to restrain

trade among indirect purchasers necessarily confers standing on those remote customers." Given the ruling that GAF has standing to assert its Section 1 camera claims on the grounds discussed *supra* at 1221–1222, the Court declines to express an opinion regarding GAF's contention that Kodak "deliberately" sought to injure it and that this "necessarily" confers standing.

ordering the manufacture of suitable cameras, which then placed it at a temporal disadvantage in the distribution and sale of compatible cameras. Accordingly, GAF was forced to sell its "old flash technology" cameras in direct competition with Kodak cameras compatible with the new flash devices, thereby forcing GAF to "unload" its cameras with less appealing flash features at "distress" prices.

The Court rules that there exists "a legally significant causal relationship between the alleged violation and the alleged injury." [11] 631 F.2d at 12. Therefore, GAF has standing to assert its § 1 camera claims.[12] Accordingly, Kodak's motion for partial summary judgment dismissing GAF's § 1 camera claims is denied.

### III. Kodacolor II and the C–41 Process

GAF's major claim under § 2 of the Sherman Act concerns Kodak's involvement in the amateur conventional still film market.

More specifically, GAF attacks as anti-competitive Kodak's design and introduction of Kodacolor II film and the concomitant C–41 photofinishing process. Kodak seeks partial summary judgment in its favor with respect to these claims.

### A. GAF's Claims

GAF contends, and Kodak concedes for purposes of this motion only, that the amateur conventional film market consists of the nationwide manufacture and sale of amateur conventional color negative film (i.e., color print film), amateur color reversal film (i.e., color slide film), amateur black and white film, and amateur color movie film, excluding instant color or black and white print film or instant color movie film. Amateur conventional still film—the subject of the present motion—is a sub-market of the amateur conventional film market and does not include amateur color movie film.[13] For purposes of this motion, Kodak

---

**11.** Kodak's claim that GAF's alleged injury is not antitrust injury, founded on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), is unpersuasive. Contrary to Kodak's contention (Reply Memorandum at 18), GAF's possible recovery would be predicated on an alleged antitrust law violation—the withholding of information about new products resulting in GAF's inability to produce (i.e., design and order to be manufactured) the new cameras. *See generally J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, —— U.S. ——, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

**12.** The Court notes that under the broader foreseeability test—a test which GAF argues was adopted by the Second Circuit in *Schwimmer*—GAF would have standing to assert its claim. There is little question that GAF's sale of cameras was "in the area which [Kodak] could reasonably [have] foreseen would be affected by the conspiracy" and that GAF was "within that area of the economy which [was] endangered by a breakdown of competitive conditions in the [camera] industry." *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 220 (9th Cir.) *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964).

**13.** Although millions of amateur photographers are probably familiar with the basic photographic process and film characteristics, a brief description of photographic film is set forth in order to assist in understanding the claims presented herein.

While films may be distinguished on the basis of a wide variety of factors, the key variables for purposes of this case are (1) a film's format or size of exposed image; (2) its speed; (3) its graininess; (4) whether it is positive or reversal; (5) whether it is color or black and white; and (6) the process necessary to develop it. Format refers to the size of the film area which is exposed to light. Still film is available in a wide variety of formats, including 110 (used in the so-called "pocket" cameras introduced by Kodak in 1972), 126 film, and 135 or 35 millimeter film.

Film "speed" refers to an emulsion's sensitivity to light and is designated by the ASA number. Generally, a film with a higher ASA number (i.e., a "faster" film) is more sensitive to light than a film with a lower ASA number.

The "grain" of a film refers generally to the emulsion's capacity to produce a clean and sharp image. A film's emulsion is comprised of tiny light-sensitive grains, which, when greatly enlarged, give a negative, a positive, or a photograph a speckled, pebbly appearance. In short, a finer grain film may be subject to greater enlargements or magnifications without an unacceptable loss in clarity.

When exposed and processed, negative film yields a "negative" which must be projected (and usually enlarged) onto light sensitive paper which, when processed, produces a photographic print. On the other hand, reversal film, when exposed and processed, yields a positive transparency which is generally projected on a screen. Slide films and movie films are reversal films.

concedes that it possessed monopoly power in these markets.

GAF's film claims under § 2 are premised, in part, upon the relationship between and interaction of films and photofinishing processes. GAF alleges, and Kodak does not contest, that films which are not process compatible with Kodak film (i.e., not processable in the same photochemicals and equipment as Kodak film) must be processed separately in order to avoid destroying or seriously denigrating the images recorded on either or both groups of films. Similarly, films which are not print compatible with Kodak film (i.e., not designed to be printed on printing equipment balanced for printing Kodak negative film) must be printed separately in order to achieve a proper rendition of the desired colors.

GAF alleges that, at all relevant times, approximately 90% of the amateur color negative film processed by independent photofinishers has been Kodak film. GAF further alleges that due to Kodak's monopoly power in the market for amateur conventional film and particularly in the field of amateur conventional color negative film, and due to the high capital costs involved in operating a second processing line, the great majority of independent photofinishers only maintained the equipment necessary to process Kodak's Kodacolor film.

From 1955 until March 1972, the standard process used by photofinishers for processing amateur color negative still film was Kodak's C–22 process which operated at 75°F. and the standard printer setup was that prescribed by Kodak for Kodacolor film. GAF alleges that prior to 1969, Kodak was the only manufacturer offering for sale amateur color negative films (Kodacolor and Kodacolor X) which could be processed using Kodak C–22 chemistry.

GAF contends that from 1955 to 1972, as a result of the widespread availability of an independent photofinisher network in the United States capable of economically processing and printing only amateur color negative film designed to be processed in C–22 chemistry and printed with the same printer balance as Kodacolor film, and the importance of these independent photofinishers as wholesalers and processers of such film, it was not commercially feasible for manufacturers of incompatible amateur color negative still films to sell significant quantities of their films to the average consumer in the United States.

In June 1969, GAF, and later other film manufacturers, began to offer for sale in the United States amateur color negative films which were process and print compatible with Kodak's C–22 process film.

In March 1972, Kodak introduced Kodacolor II in the 110 format only, the C–41 process which operated at 100°F., related photofinishing equipment and chemistry, and the 110 Pocket Instamatic camera. At the same time, Kodak allegedly announced to independent photofinishers and the public that as soon as its manufacturing capacity would permit, it intended to convert its other popular sized films to films compatible with the C–41 process and to discontinue the manufacture of films in those sizes which were compatible with the C–22 process. Indeed, commencing in September 1973, Kodak discontinued the manufacture of Kodacolor X (its C–22 compatible film) in the 126 and 135 sizes and introduced Kodacolor II in those sizes. Importantly, the films manufactured by GAF and other Kodak competitors, which were compatible with the C–22 process, were incompatible with the C–41 process.

GAF alleges that the aforementioned product introductions and announcement that Kodacolor X would be replaced by

---

Of course, films are available which produce either color or black and white finished products.  ·

Finally, films vary in the processes needed to develop them. The broadest distinction can be drawn between those films that must be developed in a laboratory and those that are developed immediately after the film is exposed (i.e., "instant" films). Within the category of laboratory-processed films, the technical processes for developing films vary on the basis of many factors. Films may only be developed in processes compatible with the film's characteristics.

Kodacolor II had both the purpose and effect of forcing independent photofinishers to convert from C–22 to C–41 processing. Allegedly as a result of Kodak's conduct, including the replacement of Kodacolor X with Kodacolor II in the 126 and 135 sizes, C–22 processing by independent photofinishers became increasingly difficult to obtain, and by 1975, the majority of independent photofinishers had ceased processing C–22 films. GAF alleges that the aforementioned conduct restricted and excluded competition in the amateur conventional still film market by causing consumers to purchase Kodacolor II film rather than GAF film.[14]

With respect to Kodacolor II and the C–41 process, GAF also attacks as anticompetitive Kodak's design conduct. GAF alleges that Kodak purposefully designed Kodacolor II for a new 100°F. process because it knew that the existing C–22 compatible films of its competitors, including GAF, could not withstand the higher temperature process without being destroyed.[15] Further, GAF alleges that Kodak reduced the format of its 110 size Kodacolor II film from 15 × 20 mm to 13 × 17 mm solely to exclude "grainier" C–22 compatible films from competition with Kodacolor II in the 110 format.[16]

Finally, for purposes of this motion, GAF alleges that Kodak failed to take reasonable measures, including disclosure of necessary technology, to avoid the anticompetitive impact of its conversion from the Kodacolor X and C–22 process to Kodacolor II and the C–41 process. Complaint at ¶ 66. GAF contends that Kodak was under a duty to disclose to GAF the technology necessary to enable it to enter the market with a C–41 compatible film at the point when C–22 processing services were not available to consumers on the same terms as C–41 processing services. GAF Brief in Opposition at 132.

Having reviewed GAF's contentions with respect to Kodak's introduction of Kodacolor II and the C–41 process, the Court will discuss the guiding principles of § 2 of the Sherman Act.

## B.  *Section 2 Principles*

In order to establish a monopolization charge under § 2 of the Sherman Act, a plaintiff must establish the defendant's possession of monopoly power and "the [defendant's] willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). Because Kodak does not now dispute its possession of monopoly power, the focus turns to the second element of a § 2 charge—the requirement of anticompetitive conduct.

Since the enactment of the Sherman Act, a "charter of freedom", *Appalachian Coals,*

---

14.  GAF also alleges that at the time of the introduction of Kodacolor II and the C–41 process, Kodak allegedly began to offer bulk processing services for Kodak's C–22 compatible film to independent photofinishers in order to encourage photofinishers to cease processing the C–22 films of GAF and other competitors. Further, GAF alleges that Kodak refused to process or make prints from films of competitors. Also, Kodak allegedly "rushed" Kodacolor II film in the 110 format to market in March 1972, despite the existence of several serious defects, in order to coerce photofinishers to convert to the C–41 process before film manufacturing competitors had gained a sufficient foothold in the C–22 compatible film market to forestall the change.

15.  In order to avoid excessive softening of the film and to prevent melting of the gelatine in the film during high temperature processing, film must be hardened. The film may either be hardened during the initial steps of the processing cycle through the use of certain hardeners in the processing solutions or be hardened during the manufacturing process by adding hardener to the film. The latter approach, known as "forehardening", is utilized by Kodak in its Kodacolor II film. Affidavit of Herbert L. Rees, sworn to July 31, 1980, at ¶ 12.

16.  GAF also alleges that Kodak abandoned research on and suppressed significant improvements in Kodacolor X film and the C–22 process and concentrated on shifting to a new higher temperature process and compatible film, because such improvements would inhibit photofinishers from converting to the C–41 process.

*Inc. v. United States,* 288 U.S. 344, 359, 53 S.Ct. 471, 473, 77 L.Ed. 825 (1933), by which Congress gave the judiciary broad discretion in formulating the parameters of liability, the federal courts have grappled with the conduct requirement of § 2. While the Supreme Court made clear early on that the mere possession of monopoly power—"monopoly in the concrete"—would not give rise to § 2 liability, *Standard Oil Company of New Jersey v. United States,* 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911), the conduct requirement has defied precise definition or reduction to a simple formulation.

In interpreting the language of *Grinnell* and other landmark cases, *Berkey* instructs courts, in general terms, to be wary of conduct which in the hands of a smaller market participant might be considered harmless or honestly industrial, but when taken by a monopolist tends to destroy competition. 603 F.2d at 275. In a similar vein, *Berkey* instructs that "to avoid the proscriptions of § 2, the [monopolist] must refrain at all times from conduct directed at smothering competition" and that a monopolist "may not wield [its monopoly power] to tighten its hold on the market." *Id.*

The various formulations of the § 2 conduct requirement seek to draw a line between lawful conduct which will ultimately benefit consumers just as free competition would and conduct which unlawfully precludes the stimulus of vigorous competition.

Although the Sherman Act was undoubtedly enacted with a variety of goals in mind—including the fostering of competition, the protection of small business entities, and the prevention of the concentration of America's wealth in the hands of a few—over the years the promotion of competition to ultimately benefit the consumer has become a paramount guiding principle of § 2 and the federal antitrust laws. Indeed, throughout the past 25 years courts have repeated the proposition that the antitrust laws are designed to protect competition not competitors. *E. g., Brunswick v. Pueblo Bowl-O-Mat,* 429 U.S. at 488, 97 S.Ct. at 697; *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502,

1521, 8 L.Ed.2d 510 (1962). Thus, a monopolist may compete, so long as it does so without wielding its monopoly power. Further, the recognition of the principle that consumers normally benefit from the "salubrious effects" of competition does not imply that a monopolist's efforts in meeting competition are to be condemned unless they are intended to promote consumer welfare. "[A] monopolist's right to compete is not limited to actions undertaken with an altruistic purpose." *Northeastern Telephone Company v. American Telephone and Telegraph Company,* 651 F.2d 76, 93 (2d Cir. 1981).

■ Turning to Kodak's challenged conduct, *Berkey* and *Northeastern Telephone* make clear, contrary to Kodak's contentions, that new product introductions by a monopolist are not *ipso facto* immune from antitrust scrutiny. *Berkey,* 603 F.2d at n.30; *see Northeastern Telephone,* at 93. Although Judge Kaufman has warned that courts should "exercise caution" in condemning a monopolist merely for introducing new products, he makes equally clear that new product introduction coupled with some associated conduct may constitute a § 2 violation. *Berkey,* 603 F.2d at n.30; *Northeastern Telephone,* at n.27.

■ The crucial legal question raised by the present motion is what constitutes "associated conduct" which makes otherwise lawful new product introductions by a monopolist unlawful under § 2. The following discussion makes clear that use of monopoly power in one market to gain an advantage in another market, as well as use of monopoly power in the same market, is condemned by § 2. Less clear is the scrutiny to be afforded design conduct. Also considered is the monopolist's withholding of information about its new products.

### 1. *Coercive Conduct*

In *Berkey,* in support of its claim that Kodak monopolized or attempted to monopolize the amateur camera market, the plaintiff challenged Kodak's concurrent introduction of its 110 Pocket Instamatic camera

and Kodacolor II film. Berkey contended that the reason that 110 cameras succeeded in the marketplace was because they were sold with Kodacolor II—promoted by Kodak as a "remarkable new film." Because Kodacolor II was initially available only in the 110 format and only Kodak made a camera that could handle 110 film, any person who wished to try Kodak's new film was compelled to buy a Kodak 110 Pocket Instamatic. Berkey further alleged that the new film, Kodacolor II, was not necessary to produce satisfactory 110 photographs and suffered from several deficiencies. Thus, claimed Berkey, Kodak's sales of 110 cameras were based on the unlawful practical tie-in between the 110 camera and Kodacolor II, rather than the intrinsic merits of Kodak's 110 cameras.

A jury verdict in favor of Berkey based upon the foregoing theory was reversed by the Circuit. The panel found that "if the availability of Kodacolor II spurred sales of the 110 camera, it did so because some consumers regarded [the film] as superior [to Kodacolor X] ...." Berkey, 603 F.2d at 287. The Circuit regarded a free marketplace as the best test of a product's quality. As long as success in the marketplace is not based upon any form of coercion, the merits and demerits of a monopolist's new products will not be placed in issue before a judge or jury. Id. The panel ultimately found that the concurrent introduction of Kodacolor II and 110 Pocket Instamatic cameras did not coerce camera purchasers. Id.

■ In footnote 39, the panel set forth examples of coercive conduct that, if present, might have resulted in Kodak being held liable. According to the footnote, Kodak might have been liable if, upon introduction of the 110 camera, it had ceased producing 126 film, thereby compelling (through use of its film market monopoly power) consumers to purchase a Kodak 110 camera (in the camera market). Thus, that example concerns the use of a firm's mo-

nopoly power in one market to coerce consumer choice in another market. Also unlawfully coercive is a monopolist's use of monopoly power in one market to coerce consumer choice of its new product in the same market. "[I]ntroduction of a new product may violate § 2 if a monopolist acts to compel customer choice by withdrawing a substitute product from the market." Northeastern Telephone, at n.27. The above-described coercion through the use of monopoly power in other markets or in the same markets is condemned because it allows a monopolist to achieve results in the marketplace that might not be achieved by a firm without such monopoly power. See United States v. Griffith, 334 U.S. 100, 107–108, 68 S.Ct. 941, 945–946, 92 L.Ed. 1236 (1948); Berkey, 603 F.2d at 275–76.[17]

■ Further, Berkey makes clear that a firm's monopoly power, as opposed to the technical superiority of its products, need not be the sole cause of its success in the marketplace in order for § 2 liability to attach. If the use of its monopoly power is a "partial root" of a monopolist's success in the marketplace, then its actions may be condemned under § 2. 603 F.2d at 292.

2. Design Conduct

While the coercive use of monopoly power in conjunction with new product introduction is clearly condemned by § 2, the scrutiny to be afforded design and engineering decisions made in connection with the introduction of a new product is unsettled. In Northeastern Telephone, at 94–95, the Second Circuit considered the plaintiff's claim that AT&T had intentionally designed protective couplers to impede competition in the terminal equipment market. Plaintiff alleged that AT&T's couplers were incompatible with plaintiff's PBX's and that the couplers required an external power source. The panel ordered a new trial on this claim, at which the plaintiff may attempt to prove that defendant's design of the coupler violated § 2. The court stated that "the rea-

17. Berkey emphasized that monopoly power must be "wielded" in order for liability to attach; mere advantages inuring to the monopo-list by virtue of its structure as an integrated firm may not ordinarily be the basis of § 2 liability.

sonableness of the couplers' design will be a crucial issue at both the liability and damages phases of [the new trial]." *Id.* at 95. In a crucial footnote, the panel stated: "In other circumstances, we might be reluctant to allow a jury to second-guess engineers' decisions as to the proper construction of a sophisticated piece of equipment. But in this case we cannot look to the reaction of the competitive market to determine whether one design is superior to another, *compare Berkey, supra,* 603 F.2d at 287. As noted previously, AT&T's post-*Careterfone* tariffs gave it the exclusive right to provide protective couplers. Market forces cannot operate under such circumstances. Thus, we see no alternative to entrusting the matter of coupler design to the judgment of the jury." *Id.* at n.29. Thus, an absolute monopolist's design conduct is subject to antitrust scrutiny by a jury.

■ Further, from a reading of footnote 29, this Court infers that the Second Circuit would allow judicial scrutiny of design conduct in situations in which "market forces cannot operate." The *Berkey* opinion, 603 F.2d at 287, indicates that, for purposes of § 2 analysis, market forces, while not "fully effective", can operate in a monopolized market so long as there is no coercion by the monopolist. Thus, design conduct would only be subject to scrutiny if the fact finder first found coercive conduct by the monopolist or coercive use of the firm's monopoly power.

■ The language of *Northeastern Telephone* and *Berkey,* 603 F.2d at 287 n.39, albeit limited, and cases from outside the Second Circuit,[18] indicate that in scrutinizing design conduct, § 2 would merely require the monopolist's design to be "reasonable", rather than to be the design alternative least restrictive of competition. Thus, the "reasonableness" of the design of a

monopolist's new products (vis-a-vis competitors' products which were technically linked to or dependent upon the monopolist's product) may be scrutinized under § 2 in cases in which "market forces cannot operate"—that is, in cases in which a single firm controls the entire market or in which a monopolist engages in coercive conduct to affect consumer choice.

### 3. *Disclosure of Technical Information*

■ In *Berkey,* Judge Kaufman stated that "withholding from others advance knowledge of one's new products . . . ordinarily constitutes valid conduct," even when engaged in by a monopolist. *Id.* at 281. The *Berkey* opinion noted that a rule requiring a monopolist to disclose technical information about its new products was infirm because (1) it would discourage competitive research and innovation, thereby "encouraging the sluggishness the Sherman Act was designed to prevent," and (2) the "inherent uncertainties [in applying the rule] would have an inevitable chilling effect on innovation." *Id.* at 282. Accordingly, an antitrust plaintiff which attacks as anticompetitive a monopolist's failure to disclose technical information about a new product "bears a heavy burden." *Id.* Thus, only in the rarest case will a monopolist's failure to disclose technical information concerning its new product support a claim for treble damages under § 2 of the Sherman Act.

Having discussed the various forms of "associated conduct" which may, when coupled with new product introduction, constitute a § 2 violation, the Court now turns to the application of the foregoing principles to the case at bar.

### C. *Application of § 2 Principles to Kodak's Summary Judgment Motion*

■ A review of the affidavits and scores of documents submitted by both par-

---

**18.** *See California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727, 744 (9th Cir. 1979); *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 438–39 (N.D.Cal.1978), *aff'd, Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981); *Transamerica Computer Co. v. IBM Corp.,* 481 F.Supp. 965, 1003 (N.D.Cal.1979), *appeal docketed* No. 80–4048 (9th Cir. 1980).

ties indicates that there presently exist genuine issues of material fact with respect to whether Kodak's conduct associated with the introduction of Kodacolor II and C–41 process was coercive, and thus unlawful under § 2. Genuine issues of material fact exist as to whether Kodak coerced photofinishers to convert to the C–41 process, thereby reducing the availability of C–22 processing and causing consumers to purchase and use C–41 compatible film. Further, a factual issue exists as to whether Kodak's withdrawal of Kodacolor X and its replacement with Kodacolor II in the 126 and 135 formats, by itself or in connection with other alleged conduct, was a coercive use of Kodak's monopoly power. Of course, the presence of these genuine issues of material fact precludes the grant of defendant's motion for summary judgment.[19] Accordingly, Kodak's motion for summary judgment with respect to GAF's § 2 claims (except as discussed below) is denied.[20]

With respect to GAF's affirmative disclosure claim, GAF contends that it can meet the concededly heavy burden imposed by *Berkey*. *See supra* at 1228. This Court disagrees. Like the unsuccessful plaintiff in *Berkey*, GAF asks the Court and the jury to "condemn Kodak retrospectively, holding that it violated § 2 and so is liable for damages, because it did not decide on its own initiative to take unusual, self-abnegatory actions." *Id.* at 285. Even if a jury were to find that Kodak's use of its monopoly power in connection with the introduction of Kodacolor II and the C–41 process

violated § 2 by creating incompatibilities with existing products of competitors, as a matter of law Kodak may not be held liable for its failure to effect the "limited" disclosure claimed by GAF. A contrary result would, for the reasons articulated in *Berkey* (*see* discussion *supra* at 1228), stifle innovation and create a rule which would defy precise or equitable application. Accordingly, insofar as ¶ 66 of GAF's amended complaint attacks Kodak's failure to disclose to GAF or other competitors technical information concerning Kodacolor II and the C–41 process, Kodak's motion for summary judgment is granted.

### IV. *Ektachrome Movie Films*

GAF's other § 2 film claim relates to the nationwide market for amateur color movie film. For purposes of this motion, Kodak concedes that it possessed monopoly power in that market at all relevant times. GAF's claims pertain to Kodak's introduction of Ektachrome movie films and the concomitant EM–25 process in 1971 and Kodak's preceding failure to introduce Ektachrome films processable in the ME–4 process. Kodak moves for summary judgment with respect to these claims.

### A. *GAF's Claims*

Prior to 1971, both Kodak and GAF marketed for amateur photographers in the United States only one type of movie film. Kodak marketed Kodachrome and GAF marketed GAF Color Movie Film. Both

---

**19.** Under the principles discussed *supra* at 1227–1228, Kodak's design conduct (i. e., the design of Kodacolor II and the C–41 process) would only be subject to scrutiny in the event that the jury were to find that Kodak engaged in coercive conduct or misused its monopoly power. In the event that design conduct became an issue, genuine issues of material fact exist as to the reasonableness of Kodak's design of Kodacolor II and the C–41 process. In the face of Kodak's proffered evidence which purportedly shows that the new Kodak products represented an improvement over old products and were thus reasonably designed, GAF has submitted affidavits and documents raising genuine issues of material fact as to the reasonableness of Kodak's designs.

**20.** Relying on *Brunswick*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701, Kodak also argues that GAF's claims should be summarily dismissed because GAF has suffered no "antitrust injury" as a result of Kodak's introduction of new products. GAF contends that Kodak used its monopoly power to maintain and extend its film market by eliminating competition from C–22 films. This alleged reduction in competition appears to be conduct which causes "antitrust injury." If it prevails on its liability case, GAF will be in a position to offer evidence to prove it suffered "antitrust injury" as a result of Kodak's conduct. Thus, defendant's summary judgment motion based upon *Brunswick* must be denied.

films had an ASA rating of 40; both were "coupler-in-developer" films;[21] and both were processed in the process used for Kodachrome film. Due to the relatively "slow" speed of these films, when used indoors or in dim light both required the use of special lights.

In 1964, Kodak introduced in Canada an amateur movie film known as Ektachrome II. Ektachrome II had an ASA rating of 40; it was an "incorporated coupler" film; and it was developed in Kodak's ME–4 process. Beginning in 1966, another version of Ektachrome II was introduced in worldwide markets except the United States. Kodak concedes that in 1966 it introduced in the United States a professional movie film with a 125 ASA rating, and in 1969 offered this film, spooled in super 8 cartridges, on a special-order basis to professionals. This film, known as SO–105, was processed in the ME–4 process; it was designed to produce optimal results when projected on television transmission equipment (see Affidavit of Robert D. Nicholas at ¶ 7 and Affidavit of James A. Kunkel at ¶ 15); and it was not offered as an amateur product.

In 1971, Kodak introduced in the United States two incorporated coupler amateur movie films, Ektachrome 160 and Ektachrome 40, which required processing in a new 125° Ektachrome process, EM–25. Ektachrome 160, with its ASA rating of 160, was an "available light" film which could be used indoors without special lights. Kodak concurrently introduced new "XL" movie cameras which featured wide aperture lenses and wide shutter openings.

GAF alleges that Kodak knew that other film manufacturers, such as GAF, seeking to offer amateur movie films in the United States could and would design high quality movie films processable in the ME–4 process if that process became widely available. Further, GAF alleges that independent photofinishers would only install the ME–4 process if Kodak were to offer a movie film designed for the ME–4 process. Thus, charges GAF, in order to exclude competition in and maintain its monopoly over the amateur movie film market, Kodak deliberately suppressed the introduction in the United States of regular speed and available light Ektachrome amateur movie films processable in the ME–4 process, until it had designed Ektachrome movie films processable in the EM–25 process. GAF alleges that the "exclusionary" EM–25 process created serious and virtually insurmountable problems to competitive film manufacturers desiring to market a compatible movie film, and that its introduction had the purpose and effect of foreclosing all Ektachrome compatible competition for many years.

GAF claims that it was prepared to manufacture and market films processable in the ME–4 process, but did not because processing for such films would not have been widely available so long as Kodak did not market an ME–4 film. GAF apparently seeks damages for the lost profits it would have made on the sales of a film it would have manufactured and marketed if Kodak had not withheld a ME–4 film from the United States market and introduced EM–25 Ektachrome films.

In sum, GAF attacks as anticompetitive (1) Kodak's introduction in 1971 of the allegedly exclusionary EM–25 process and Ektachrome 160 and 40 and (2) Kodak's allegedly deliberate suppression of Ektachrome films processable in the ME–4 process. These two allegations will be discussed in turn.

---

21. A coupler-in-developer film refers to a film in which the color-forming couplers become part of the film only during processing. Other types of reversal films, such as Ektachrome, are "incorporated coupler" films, in which the color-forming coupler becomes a part of the film during manufacturing. Kodak concedes that the developing process for an incorporated coupler film requires fewer processing steps than for a coupler-in-developer film. *See* Affidavit of John J. Welsh at ¶ 7. In addition, due to inherent limitations in the underlying technology, acceptable quality high speed coupler-in-developer films have never been manufactured. *See id.*; Affidavit of Alexander Altavilla at ¶ 9.

### B. *Kodak's Introduction of EM–25 Process and Compatible Films*

GAF charges that Kodak introduced EM–25 Ektachrome movie films and the EM–25 process with the purpose and effect of foreclosing all Ektachrome compatible competition for many years. Amended Complaint at ¶ 48 and ¶ 67. As discussed *supra* at 1226–1228, new product introduction by a monopolist is only condemned by § 2 if accompanied by unlawful associated conduct. Although ordinary competitive forces of supply may not be fully effective in a market dominated by a monopolist, a monopolist must generally be responsive to the demands of its customers. *Berkey*, 603 F.2d at 287. Thus, absent coercion, Kodak's mere introduction of a new product may not support an award of treble damages. Unlike its allegation with respect to Kodacolor II print film and the C–41 process, here GAF does not allege that Kodak used its monopoly power to coerce consumer acceptance of Ektachrome 160 and Ektachrome 40.[22] Indeed, upon introduction of its Ektachrome amateur movie films and the EM–25 process, Kodak did not withdraw its Kodachrome films or Kodachrome process from the market,[23] thereby forcing a massive conversion by independent photofinishers from the Kodachrome process to the EM–25 process.

█ Further, as discussed *supra* at 1227–1228, a monopolist's design conduct is only subject to scrutiny when a product is introduced in a market in which competitive forces cannot operate. Although the amateur film market was monopolized, Kodak did not wield its monopoly power in introducing its Ektachrome films; the market was not one in which competitive forces could not operate. Thus, the reasonableness of the design of Kodak's Ektachrome films and the EM–25 process may not be placed in issue before a judge or jury. *Northeastern Telephone*, at n.29; *see supra* at 1227–1228.

### C. *Kodak's Suppression of Ektachrome Films Compatible with the ME–4 Process*

GAF's primary claim with respect to amateur movie film regards Kodak's failure to market in the United States an Ektachrome movie film processable in the ME–4 process. GAF contends that without a Kodak ME–4 processable film in the market, photofinishers would not install the ME–4 process, and thus ME–4 processable films introduced by GAF would be doomed due to the lack of widely available ME–4 processing services. GAF's claim suffers from several infirmities which mandate that Kodak's summary judgment motion be granted.

█ Initially, GAF's theory requires the Court to accept the proposition that the "conduct" requirement of § 2—the requirement that a monopolist exercise its power to maintain or extend market control—may be satisfied by a firm's failure to introduce a new product. The Court is reluctant to accept that proposition for several reasons. Ordinarily, a firm may market new products if and when it chooses. *See Berkey*, 603 F.2d at 286. To create the possibility that treble damages might be awarded on the basis of a finding (made with the benefit of hindsight) that a firm's failure to introduce a product was anticompetitive would impose a significant chilling effect on innovation and research not envisioned by § 2. In addition, this inevitable chilling effect on innovation and competitive research would be heightened as a result of the uncertainty which would be promoted if GAF's proferred theory were to be applied. Similar to the predisclosure rule rejected in *Berkey*, "it is difficult to comprehend how a major corporation, accustomed though it is to making business decisions with antitrust considerations in mind, could possess the omniscience to anticipate all the instances in which a jury might one day in the future retrospectively conclude that [marketing a

---

**22.** Kodak's alleged suppression of a ME–4 Ektachrome film, to the extent that it might be considered "coercive", is discussed *infra* at 1231–1233.

**23.** Although Kodak introduced in 1974 new Kodachrome movie films and a new process for developing Kodachrome films, *see* Rees Affidavit, sworn to July 31, 1980, at ¶¶ 68–72, GAF asserts no allegations with respect to the introduction of those films or process.

newly developed product] was warranted." 603 F.2d at 282. "And it is equally difficult to discern workable guidelines that a court might set forth to aid the firm's decision." *Id.* The chilling effect on innovation would encourage the very industrial sluggishness the Sherman Act was designed to prevent. Notably, so far as this Court is aware, no court has yet found a monopolist's failure to market a product as satisfying § 2's conduct requirement.

■ Secondly, even if the court were to accept the proposition that a monopolist's failure to introduce a new product could constitute willful maintenance of its monopoly power, the ability of the judicial system to determine whether a product should have been marketed and, if so, when is severely limited. Just as Judge Kaufman has expressed grave reservations in allowing a jury to second-guess engineering and product design decisions, *Northeastern Telephone*, at n.29, marketing decisions, especially those pertaining to the introduction of relatively sophisticated products such as film and developing processes, should rarely be second-guessed by a jury or judge. Even if the courts could develop an equitable legal standard by which to judge a monopolist's failure to market new products—no easy task in itself—application of the legal standard would require the trier of fact to scrutinize quite complex and multifaceted business decisions and would impose upon the judicial process the very serious burden of attempting to determine whether a failure to introduce a product was genuinely industrial or was anticompetitive. Thus, only in the rarest case—not presented here—should a monopolist's failure to market a product be subject to antitrust scrutiny.[24]

■ Third and finally, under *Reading Industries*, 631 F.2d 10, and other controlling Second Circuit cases (*see* discussion *supra* at 1220–1221), GAF's claim must be dismissed because "it predicates its claim of injury on a basis too tenuous and conjectural for a valid causal finding of anticompetitive effect and damages." 631 F.2d at 14. Similar to plaintiff's theory in *Reading Industries*, GAF's theory of antitrust injury depends upon a series of events that would engage the factfinder in prohibited speculation. Under its theory, GAF asserts that if Kodak had introduced a ME–4 compatible film, then numerous photofinishers would have installed the ME–4 process, thereby permitting GAF to successfully market a ME–4 compatible film. At a minimum, the factfinder would have to speculate as to (1) whether Kodak's ME–4 film and process would have been accepted in the marketplace; (2) whether numerous independent photofinishers would have installed the ME–4 process; (3) whether GAF could have produced an ME–4 compatible film; (4) whether GAF's film, if produced, would have been of a quality similar to or better than Kodak's film; (5) whether other film manufacturers would have entered the market; (6) the volume of film that would have been sold by GAF; and (7) the dollar amount of profits that GAF would have earned.

**24.** The Court is also troubled insofar as GAF's theory is founded on the premise that a monopolist has a duty to lead the field in new product introduction. GAF alleges that the ME–4 process "utilized less expensive, simpler processing equipment than the Kodachrome process, was easier to control and permitted the design of high speed 'available' or 'existing' light movies." Amended Complaint at ¶ 46. Despite all the purported advantages of the ME–4 process, GAF did not manufacture or market a ME–4 compatible film or a process similar to ME–4. Essentially, GAF claims that Kodak failed to fill a void in the amateur movie film market, and GAF could not take advantage of that void because of the unavailability of the ME–4 process on a widespread basis. However, if GAF was prepared, as it contends, to introduce ME–4 processable films, especially an available light film, it could have seized the opportunity to fill the perceived void in the amateur movie film market. Had it marketed a quality available light amateur movie film and concomitant process prior to the introduction of Kodak's Ektachrome 160 in 1971, GAF might have captured a significant share of the amateur movie market. Instead, it appears that GAF wished to follow Kodak's lead, so long as Kodak manufactured films that could be readily duplicated. The protections and goals of § 2 should not be perverted so as to allow GAF to benefit from its failure to compete. *See Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48 (2d Cir. 1979).

Interpreting the landmark case of *Illinois Brick*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, the *Reading Industries* panel recognized "that there are inherent limitations in the substantive protection afforded by the antitrust laws: they exclude claims based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change." Here, GAF's theory would require the court and jury to engage in speculation not countenanced by the appellate courts' interpretations of § 2.

In sum, for all the reasons stated above, Kodak's motion for summary judgment with respect to GAF's § 2 movie film claims is granted. The claims asserted in paragraphs 44 through 49 and paragraph 67 (insofar as they relate to movie films) of the amended complaint are hereby dismissed.

## V. Patent Practices

GAF alleges that, together with Kodak's other alleged anticompetitive conduct, Kodak has maintained its monopoly over the photographic industry generally and its monopolies over component relevant markets of the photographic industry by engaging in various unlawful patent practices. Kodak moves for summary judgment with respect to all of GAF's patent-related claims. Each of those claims will be discussed seriatim.

### A. Refusal to License

In paragraph 60 of its amended complaint GAF alleges that "[i]n furtherance of its illegal monopoly, Kodak refused to license any photochemical patents ... until five years after they issued so that Kodak licensed only old technology, thus further impeding effective competition." Kodak concedes that it had a policy of licensing patents only after it had operated under the patent on a commercial basis for a reasonable period of time. Generally, the reasonable period of time was approximately five years.

Like the plaintiff in *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981), *cert.*

*petition filed*, 49 U.S.L.W. 3955 (June 10, 1981), GAF contends that a monopolist's unilateral refusal to license a patent should be treated like any other refusal to deal by a monopolist. After discussing the inherent conflict between the antitrust and patent laws, the Second Circuit rejected SCM's contention, holding that "a patent holder is permitted to *maintain* his monopoly through conduct permissible under the patent laws" and that a unilateral refusal to license a patent for its seventeen year term is conduct expressly permitted by the patent laws. *Id.* at 1204.

■ Thus, Kodak's unilateral refusal to license internally developed patents may not trigger liability under the antitrust laws. Accordingly, Kodak's summary judgment motion is granted with respect to paragraph 60 of the amended complaint.

### B. Failure to Comply with § 112 of the Patent Code

In paragraph 61(iii) and (iv) of its amended complaint, GAF alleges that Kodak "consciously and systematically failed to adequately disclose the 'best mode' for using Kodak's patented technology" and "obtained patents which failed to contain full, clear, concise descriptions of the patented invention and/or the manner by which persons skilled in the art could make and use said patents." Section 112 of the Patent Code, 35 U.S.C. § 112, provides that the specification included with a patent application:

> "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

As indicated in letters dated May 20 and June 2, 1980 from GAF's counsel to Kodak's counsel, GAF's contentions concern ten patents relating to chemistries and emulsions

utilized in Kodacolor X and Kodacolor II films, and Ektacolor papers.

The affidavit of J. Allen Jones, Director of the Patent Department of Kodak, ("Jones Affidavit"), submitted by Kodak, indicates that the inventions covered by the ten patents were developed internally by Kodak employees, that each invention for which patent protection was sought was believed to be patentable under the criteria established by United States patent law, and that Kodak neither threatened nor instituted a patent infringement action against GAF or anyone else based on any of the ten patents. In response, GAF has submitted nothing to indicate what was purportedly not "full, clear, concise and exact" about the descriptions contained in the ten patents, and does not identify what modes of use were purportedly not described. Nor has GAF stated how the alleged deficiencies in Kodak's patent applications affected GAF or competition in the marketplace.

■ With respect to a § 2 claim founded upon allegations that a patent was procured in contravention of the requirements of § 112 of the Patent Code, an antitrust plaintiff must show that the patents at issue had been obtained improperly by means of an intentional fraud on the Patent Office and that the patent owner enforced its patents by exclusionary infringement suits or threats of suit. *Walker Process, Inc. v. Food Machinery Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). This relatively high standard of proof is

necessary because any lesser standard "might well chill the disclosure of inventions through the obtaining of a patent because of fear of the vexations or punitive consequences of treble-damage suits." *Id.* at 180, 86 S.Ct. at 351 (Harlan, J., concurring).

Through the Jones Affidavit, Kodak has produced competent evidence indicating that GAF cannot meet the standard of proof imposed by *Walker Process*. In response, GAF has failed to produce a shred of evidence supporting its claims. Accordingly, Kodak's motion for summary judgment is granted. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir. 1980). The allegations of paragraph 61(iii) and (iv) of the amended complaint are dismissed.

## C. *Trivial Patents*

■ In paragraph 61(v) of its amended complaint, GAF alleges that Kodak "unlawfully maintained its monopoly by obtaining great numbers of improvement patents which, for the most part, covered technological developments that were not basic, but constituted at most only modest improvements in old technology." This allegation is a restatement of the claims set forth in paragraphs 9(d) and 9(e) of GAF's 1977 Responses to Interrogatory 2(f), as supplemented by a letter dated May 20, 1980 from GAF's counsel to Kodak's counsel.[25] In essence, GAF contends that Kodak applied for and had issued to it over 100 patents

---

**25.** Paragraphs 9(d) and 9(e) of GAF's Responses to Interrogatory 2(f) charged that Kodak engaged in:

"Illegal patent practices and policies in connection with patents obtained by [Kodak] for photosensitive products, processes, and compounds, including:

"(d) filing patent applications in the United States Patent and Trademark Office for alleged inventions which are the same as or trivial variances of the alleged inventions described or claimed in United States patents previously issued to Eastman, and prosecuting such applications and permitting patents for such applications to be issued to it, in order to reestablish or with the effect of reestablishing expired and expiring patents thereby to extend unlawfully the statutory

17-year right of exclusion granted by said previously issued patents; (e) filing patent applications in the United States Patent and Trademark Office for alleged inventions which are the same as or trivial variances of the alleged inventions described or claimed in United States patents previously issued to Eastman, and prosecuting such applications and permitting patents for such applications to be issued to it, in order to create or with the effect of creating an illusion in the public mind that such prior art subject matter is within the legitimate scope of such patents, or to increase or with the effect of increasing the expense to competitors of Eastman, including GAF, and to the public in general of determining the legitimate scope of such patents."

covering inventions that were "the same as or trivial variances of the alleged inventions described or claimed in the U.S. Patents previously issued to [Kodak]" in order to (1) unlawfully extend the statutory seventeen-year right of exclusion granted by the previously issued patents, (2) create an illusion that the prior art subject matter was within the legitimate scope of the new patents, and (3) increase the expense to Kodak's competitors of determining the legitimate scope of the patents.[26] The relevant group of patents pertain to Kodacolor X and Kodacolor II films, Ektacolor papers, and 110, 126 and Super 8 cartridges and cameras.

Kodak's alleged practice, in light of the alleged purposes for which it was carried out, essentially concerns patent misuse pertaining to the procurement of internally developed patents. Thus, the strict standard of proof mandated by *Walker Process* is applicable.[27]

Similar to GAF's claims previously discussed, the Jones Affidavit submitted by Kodak indicates that the inventions covered by the relevant patents were developed internally by Kodak employees, that each invention for which patent protection was sought was believed to be patentable under the criteria established by United States patent law, and that, with the exception of a single infringement action commenced by Kodak in 1965 against Universal Tool & Manufacturing Corporation and U.S. Camera Corporation (involving U.S. patent no. 3,148,605 which pertains to metering mechanisms used in Kodak 126 size cameras), Kodak has neither instituted nor threatened to institute a patent infringement action against GAF or anyone else on the basis of the patents in issue. GAF has failed to produce any relevant evidence in opposition to Kodak's affidavit, thereby indicating that it is unable to meet the standard imposed by *Walker Process*. Accordingly, Kodak's summary judgment motion is granted and the claim stated in paragraph 61(v) of the amended complaint is dismissed.

### D. *Licensing Practices*

In paragraph 63 of its amended complaint, GAF alleges that

"[Kodak] refused to license important patents required to compete with [Kodak] unless GAF agreed to: (i) calculations of royalties depending on the extent of unpatented products employed with the licensed product or process, (ii) extension of royalty obligations beyond the life of the patents involved in a particular license, (iii) compulsory packaging of many patents as a condition to the licensing of any patents, and (iv) excessive royalty rates."

*SCM Corp. v. Xerox Corp.*, 645 F.2d at 1205, makes clear that "patent *acquisitions* are not immune from the antitrust laws." Further, the district court in *SCM Corp. v. Xerox Corp.*, 463 F.Supp. 983, 1007 (D.Conn.1978), *remanded*, 599 F.2d 32 (2d Cir.), *on remand*, 474 F.Supp. 589 (D.Conn.1979), *affirmed and remanded*, 645 F.2d 1195 (2d Cir. 1981), held that:

> "[O]nce a company had acquired monopoly power, it could not thereafter acquire lawful patent power if it obtained new patents on its own inventions primarily for the purpose of blocking the development and marketing of competitive products rather than primarily to protect its own products from being imitated or blocked by others."

As noted, *supra* at n.26, this Court has previously ruled that GAF's purported "patent blocking" claim was not pleaded or otherwise asserted in an early stage of the patent-related discovery and, thus, may not be pursued in this action.

---

**26.** The allegations of paragraph 61(v) of the amended complaint should not be confused with GAF's purported "patent blocking" claim which, by parrotting the language of the district court opinion in *SCM Corp. v. Xerox Corp.*, 463 F.Supp. 983, 1007 (D.Conn.1978), quoted at n.27 *infra*, alleged that Kodak accumulated a vast number of patents for the purpose of blocking competition. In an Order dated June 17, 1981, this Court ruled that GAF's "patent blocking" claim could not be pursued in this action. The three alleged purposes for which Kodak procured numerous allegedly trivial patents are separate and distinct from the blocking purpose that this Court previously found to be outside this lawsuit. *See* Order dated June 17, 1981 at 3–10.

**27.** In applying *Walker Process* to GAF's § 112 claims and its "trivial patents" claims herein, the Court does not wish to imply that *Walker Process* prescribes the exclusive means by which patent related conduct may violate the antitrust laws. The Second Circuit's opinion in

GAF's allegations are directed to twelve license agreements it entered into with Kodak between 1957 and 1967. These agreements include: five agreements executed between 1957 and 1967 by which GAF was licensed under fifteen Kodak patents relating to color print paper, color movie film and color print film; three agreements executed in 1965 and 1967 by which GAF was licensed under six Kodak patents relating to the "cascade" method of coating film and paper base; and four agreements executed between 1964 and 1966 by which GAF was licensed under twelve Kodak patents relating to Super 8 movie and 126 size still cameras and film cartridges.

■ In general, a patent holder owns a statutory monopoly, 35 U.S.C. § 154, and thus is given great leeway in establishing the terms and royalty rates by which it licenses its patents. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135–36, 89 S.Ct. 1562, 1582–1583, 23 L.Ed.2d 129 (1969); *Brulotte v. Thys Co.*, 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964). Further, as set forth by the Second Circuit in *SCM Corp. v. Xerox Corp.*, 645 F.2d at 1204–1206, maintenance of a patent monopoly through conduct permissible under the patent laws cannot trigger any liability under the antitrust laws.

An examination of each of the four licensing practices challenged by GAF indicates that Kodak's conduct was permissible under prevailing patent law and antitrust law precedents.

### 1. Calculation of Royalties on Basis of Value of Unpatented End Products

GAF challenges Kodak's practice of calculating royalties "depending on the extent of unpatented products employed with the licensed product or process." As an example, GAF points to Kodak's practice of basing its royalty rates for its cartridge patents on the type and amount of film used in the cartridge.

■ Patent license agreements are valid so long as royalties are based upon products which use the teaching of the patent. *Zenith Radio*, 395 U.S. at 135, 89 S.Ct.

at 1582. It is uncontroverted that all of GAF's license agreements called for royalties only on products which used the teaching of one or more licensed patents. Jones Affidavit, ¶¶ 15, 16, 19, 22, 23, 30. The fact that royalties were based on the selling price (i. e., commercial value) of products which incorporated teachings of licensed patents does not render the license agreements illegal. *See Zenith Radio*, 395 U.S. at 135–36, 89 S.Ct. at 1582–1583. Thus, GAF's claim may not stand.

### 2. Extension of Royalty Obligations

■ GAF alleges that Kodak extended royalty obligations beyond the life of the patents involved in a particular license. The uncontroverted evidence indicates that none of GAF's license agreements called for royalties to be paid after all the patents in the license package had expired. Jones Affidavit, ¶¶ 15, 21, 29. The Supreme Court has expressly approved the payment of royalties on all patents in a license package until the expiration of the last patent in the package. *Brulotte*, 379 U.S. at 30, 33, 85 S.Ct. at 178–179; *see also Beckman Instruments, Inc. v. Technical Development Corp.*, 433 F.2d 55, 61 (7th Cir. 1970), *cert. denied*, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971). Thus, GAF's claims in this regard are without merit.

### 3. Compulsory Packaging of Patents

GAF alleges that Kodak insisted upon compulsory packaging of many patents as a condition to the licensing of any patents. Kodak has presented competent evidence indicating that GAF either specifically requested each patent under which it was licensed, or it had the right to accept or reject a license under any individual patent offered by Kodak, and that Kodak never conditioned the grant of a license under any patent on GAF's acceptance of a license under another patent. Jones Affidavit, ¶¶ 20, 24, 30. Further, the Jones Affidavit, ¶¶ 14, 18, indicates that in some instances GAF sought and obtained the inclusion of additional patents in a license agreement. Additionally, GAF retained the right to uni-

laterally terminate many of the licenses. Jones Affidavit, ¶¶ 19, 21, 30. Rather than specifically refute any of these claims, GAF's affidavit in opposition (Affidavit of Emil B. Rauch, ¶ 8) merely states that, due to the large number of patents held by Kodak, "GAF had no real choice but to seek licenses under whatever [Kodak] patents were necessary to manufacture a compatible product." Importantly, GAF fails to refute Kodak's statement that it never conditioned the grant of a license under any patent on GAF's acceptance of a license under another patent.

■■■ GAF's failure to refute evidence indicating that its claim is without merit is itself sufficient grounds upon which to grant Kodak's summary judgment motion. *Quinn*, 613 F.2d at 444–45. Further, GAF's contention that it was coerced into accepting Kodak's patent packages due to Kodak's economic power and its possession of numerous patents is without support, especially in view of the fact that GAF did not protest the terms of the license agreements, cf. *Glen Manufacturing, Inc. v. Perfect Fit Industries, Inc.*, 420 F.2d 319, 321 (2d Cir.), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970) or produce "overwhelming evidence that demands . . . for something less than the license package offered would have been rejected . . . ." *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648, 703 (D.S.C.1977), *mod. on other grounds*, 594 F.2d 979 (4th Cir. 1979), *cert. denied sub nom., Ateliers Roannais de Constructions Textiles v. Duplan Corp.*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980).

### 4. *Excessive Royalty Rates*

■■■ Finally, GAF alleges that Kodak charges "excessive" royalty rates under its license agreements. An antitrust claim based upon excessive royalty rates is precluded by the Supreme Court's express recognition of the principle that "[a] patent empowers the owner to exact royalties as high as he can negotiate." *Brulotte*, 379 U.S. at 33, 85 S.Ct. at 179; *see also W.L. Gore & Associates, Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976). Thus, GAF's claim is without merit.

### 5. *Summary re License Practices*

The foregoing discussion indicates that there exist no genuine issues of material fact as to GAF's licensing claims set forth in paragraph 63 of its amended complaint. Accordingly, Kodak's summary judgment motion with regard to paragraph 63 of the amended complaint is granted.

### F. *Summary re Patent Practices*

With the exception of the allegations set forth in paragraph 61(i) and (ii) of the amended complaint,[28] Kodak has demonstrated that there exist no genuine issues of material fact as to GAF's patent practices. Accordingly, Kodak's motion for partial summary judgment is granted with respect to paragraphs 59 through 63 (except paragraph 61(i) and (ii)) of the amended complaint.

### VI. *Summary*

GAF's partial summary judgment motion precluding Kodak from relitigating certain factual determinations made by the jury in *Berkey*, based on the doctrine of offensive collateral estoppel, is granted.

Kodak's motion for partial summary judgment with respect to GAF's camera claims under § 1 of the Sherman Act, on the ground that GAF lacks standing to sue under § 4 of the Clayton Act, is denied.

28. In paragraph 61(i) and (ii) of its amended complaint, GAF alleges that Kodak "engaged in trade secret and patent practices designed to hinder GAF and others from making and marketing compatible color films" and "maintained its monopoly by protecting, in the field of color film, the technology necessary to manufacture compatible products with both trade secrets and patents." Apparently because Kodak's partial summary judgment motion was filed prior to the Court's Orders dated April 22, May 5, and June 17, 1981 which directed GAF to file an amended complaint setting forth its claims, Kodak did not specifically address the broad allegations of paragraph 61(i) and (ii) in its moving papers. Therefore, summary judgment would be inappropriate at this time.

Kodak's motion for partial summary judgment with respect to GAF's claims pertaining to Kodak's alleged monopolization of the amateur conventional still film market through its design and introduction of Kodacolor II film and the C–41 process is denied, except as to GAF's disclosure claim. With respect to GAF's claim that Kodak had a duty to disclose technical information to GAF regarding Kodacolor II and the C–41 process, Kodak's motion for partial summary judgment is granted.

Kodak's motion for partial summary judgment with respect to GAF's allegation that Kodak monopolized the amateur color movie film market through its conduct concerning Ektachrome movie films is granted.

Kodak's motion for partial summary judgment with respect to GAF's patent claims is granted, except as to paragraph 61(i) and (ii) of the amended complaint.

SO ORDERED.